IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

CLYDE A. SEVERSON and SUSAN
C. SEVERSON, husband and wife, and
SUSAN CAROL SEVERSON, TRUSTEE,
and CLYDE ALVIN SEVERSON,
TRUSTEE, of THE SUSAN CAROL
SEVERSON TRUST,

Case No. 1:10-cv-03123-CL

                        Plaintiffs,

            v.                                                  REPORT & RECOMMENDATION

CHASE MANHATTAN MORTGAGE
COMPANY, a New Jersey corporation, and
CHASE HOME FINANCE, LLC, a New
Jersey limited liability company, subsidiaries
of JPMORGAN CHASE AND COMPANY,
a New Jersey Corporation, and JPMORGAN
CHASE AND COMPANY,

                        Defendants.

_____

CLARKE, Magistrate Judge.

Plaintiffs Clyde Severson and Susan Severson ("plaintiffs") bring this action against

defendants Chase Manhattan Mortgage Company, Chase Home Finance, LLC, and JPMorgan

Chase and Company ("defendants"), claiming breach of contract, intentional infliction of

emotional distress, negligent injury to reputation and defamation, money had and received, and wrongful initiation of civil proceedings.  Before the Court is defendants' motion for partial summary judgment (#62).  For the reasons stated below, the Court recommends that defendants' motion be granted in part and denied in part.

## BACKGROUND

The following facts are taken in the light most favorable to plaintiffs:

Plaintiffs are citizens of the state of Oregon who generate income by acquiring real estate.  Third Am. Compl., ¶¶ 1, 5, 9.  Plaintiffs look for and buy distressed properties to repair and sell or rent for a profit.  Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 3.  Plaintiffs secure the capital they need for these acquisitions from institutional lenders.  Id.  Plaintiffs currently insure fourteen properties under an umbrella policy with Foremost Insurance Corporation ("Foremost").  Pltf.'s Ex. 3, pp. 1.  Two of these properties have mortgages serviced by defendants.  Third Am. Compl., ¶ 5.

Defendants are JPMorgan Chase and Company, a New Jersey corporation that conducts business throughout the nation and world, and two of its wholly owned subsidiaries, Chase Manhattan Mortgage Company and Chase Home Finance LLC.  Id., ¶ 2.  Defendants serviced the mortgages on two of plaintiffs' rental properties in Oregon.  Id., ¶ 5; Clyde Severson Aff., ¶ 2.  One property is located at 7500 Gladstone Avenue in White City, Oregon ("Gladstone"), and the other is located at 243 Highway 234 in Eagle Point, Oregon ("Hwy. 234").  Id., ¶¶ 5-6.

Plaintiffs originally financed the Gladstone and Hwy. 234 properties in November of 2000, through Sierra Pacific Mortgage Company.  Def.'s Ex. 1, pp. 1; Def.'s Ex. 2, pp. 1.  Thereafter, Washington Mutual took over servicing the properties' mortgages.  Third Am. Compl., ¶ 5; Def.'s Ex. 3, pp. 3.  Washington Mutual, however, went into receivership on

September 25, 2008, and the Federal Deposit Insurance Corporation assigned Washington

Mutual's assets to defendants. Def.'s Ex. 11, pp. 2-4. As a result, defendants began servicing

the Gladstone and Hwy. 234 mortgages in September of 2008.

When defendants assumed the Gladstone and Hwy. 234 mortgages, defendants became

responsible for paying the properties' taxes and fire insurance premiums. Third Am. Compl., ¶

7. Defendants paid these, in accordance with the mortgages' terms, out of the mortgages' escrow

impoundment accounts ("escrow accounts"). Id. In order to ensure the escrow accounts had

sufficient funds for defendants to make these payments, defendants charged plaintiffs, in addition

to principal and interest, a pro rata amount each month. Id. Plaintiffs' payment of this pro rata

amount is the genesis of the controversy currently before the court.

After defendants assumed the Gladstone and Hwy. 234 mortgages in September of 2008,

Foremost sent defendants a bill for the December 15, 2008 to December 15, 2009 policy period.[1]

Def. Ex. 4, pp. 1. The record indicates that the bill represented the insurance premiums for

twelve of plaintiffs' properties, including the Gladstone and Hwy. 234 properties serviced by

defendants.[2] Def.'s Mem. in Supp. of Mot., pp. 2-3. The bill listed the premium due on each

property, as well as the total amount due for all twelve premiums. Def. Ex. 4, pp. 3-4. The

Gladstone and Hwy. 234 properties' premiums were each $291. Id. The total bill for the twelve

properties' premiums came to $2,403. Id., pp. 1. Defendants paid the bill for the twelve

premiums in full and applied it entirely to the Gladstone escrow account. Def.'s Mem. in Supp.

of Mot., pp. 2, 3. In doing so, defendants treated the entire bill as if it exclusively represented

the Gladstone premium. At the time defendants paid and applied the bill, the Gladstone

property's escrow account balance was $425.96. Pltf.'s Ex. 5, pp. 1. Thus, defendants' payment

---

[1] The bill was countersigned on October 22, 2008. Def.'s Ex. 4, pp. 1
[2] It is not clear from the record why two of plaintiffs' properties insured under the umbrella policy with Foremost were omitted from the bill.

overdrew the Gladstone escrow account.  Def.'s Mem. in Supp. of Mot., pp. 3.

Foremost proceeded to bill defendants again for the same policy period, December 15, 2008 to December 15, 2009.[3]  Def. Ex. 4, pp. 9.  The record indicates that this bill represented the premiums for all fourteen of the properties insured under plaintiffs' umbrella policy with Foremost, including the Gladstone and Hwy. 234 properties serviced by defendants.[4]  Id.  This bill came to $2,985.  Id.  Defendants also paid this bill in full and applied it entirely to the Hwy. 234 escrow account.  Def.'s Mem. in Supp. of Mot., pp. 3.  In doing so, defendants treated the entire bill as if it exclusively represented the Hwy. 234 premium, resulting in the overdraw of the Hwy. 234 escrow account.  Id.

On December 8, 2008, Foremost also sent plaintiffs a bill for the December 15, 2008 to December 15, 2009 policy period.  Def.'s Ex. 3, pp. 7.  The bill represented the insurance premiums for plaintiffs' twelve properties not serviced by defendants, for which plaintiffs were responsible.  Def.'s Mem. in Supp. of Mot., pp. 3; Clyde Severson Aff., ¶ 7.  The bill came to $2,404, and plaintiffs paid the bill on Dec. 12, 2008.  Def.'s Ex. 3, pp. 7; Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 4.  By paying this bill, plaintiffs, in effect, paid most of the policy premiums under the Foremost umbrella policy for a third time.

To remedy the Gladstone and Hwy. 234 escrow account balance deficiencies, defendants increased plaintiffs' pro rata monthly escrow payments on both mortgages.  Def.'s Mem. in Supp. of Mot., pp. 3.  Plaintiffs refused to pay the increased escrow payments, insisting that defendants had made a mistake when they paid, in full, both bills from Foremost.  Id.  As a result

---

[3] This bill was countersigned on December 11, 2008.  Def.'s Ex. 4, pp. 9.
[4] The bill, as submitted in Def. Exhibit 4, pp.  9, is not itemized. The court is able to infer that it represents the combined premiums for all fourteen of the plaintiffs' properties because of an itemized invoice and an itemized bill available in the record. Def. Ex. 3, pp. 7; Def. Ex. 4, pp. 3-8.

of plaintiffs' refusal to increase their escrow payments,[5] defendants began applying plaintiffs'

mortgage payments for the Gladstone and Hwy. 234 properties to the properties' escrow

accounts, rather than to the principal and interest on the loans.  Clyde Severson Aff., ¶ 11.

Defendants declared the Gladstone mortgage in default in December of 2008.  Pltf.'s Mem. in

Resp. to Def.'s Mot., pp. 5.

Foremost, in acknowledgement of defendants' double payment of plaintiffs' umbrella

policy, issued a refund to plaintiffs for $1,821 on December 22, 2008.  Id.; Def.'s Ex. 5, pp. 3.

This refund was owed to defendants, but the record indicates that Foremost sent a check to the

plaintiffs, in compliance with the terms of plaintiffs' insurance policy.  Def.'s Ex. 3, pp. 9.  The

$1,821 defendants reimbursed plaintiffs represented the difference between the $2,403

defendants paid Foremost (and applied to the Gladstone property escrow account) and the

insurance premiums defendants actually owed on both the Gladstone and Hwy. 234 properties.

Id.  Plaintiffs forwarded $1,800 of the refund from Foremost to defendants, which defendants

applied to the Gladstone property escrow account.  Id.

Plaintiffs reimbursed defendants $1,800, rather than the full $1,821 plaintiffs received

from Foremost, because defendants told plaintiffs that a payment of $1,800 was sufficient to

refund the Gladstone escrow account and resolve the payment deficiencies on the mortgage.

Clyde Severson Aff., ¶ 13.  There is no indication in the record that defendants, after receiving

and applying the $1,800 to the Gladstone escrow account, transferred $291 from the Gladstone

account to the Hwy 234 account to correct both accounts' balances.  What is clear from the

record is that after plaintiffs made the $1,800 payment, defendants continued to claim that the

plaintiffs were delinquent on the Gladstone mortgage.  Pltf.'s Mem. in Resp. to Def.'s Mot., pp.

---

[5] It is not clear from the record whether plaintiffs continued paying the original pro rata amount into the mortgages'
escrow accounts.

7.

On March 11, 2009, Foremost refunded defendants' payment of $2,985 on plaintiffs' entire umbrella policy with Foremost. Def.'s Mem. in Supp. of Mot., pp. 3. This completely refunded defendants for the bill defendants paid and applied to the Hwy. 234 escrow account. Id. Defendants applied this refund to the Hwy. 234 escrow account in full. Id. This refund did not resolve the accounting conflict between plaintiffs and defendants regarding the Hwy. 234 mortgage.

On May 13, 2009, Clyde Severson sent defendants a letter expressing his frustration regarding defendants' accounting mistakes on the Gladstone and Hwy. 234 mortgage accounts. Pltf.'s Ex. 7, pp. 1. In this letter, Clyde Severson also stated that he and Susan Severson had been receiving harassing phone calls from defendants' collection agency for months, which was stressful because Susan Severson was undergoing chemotherapy. Id. On May 29, 2009, defendants sent plaintiffs a letter acknowledging having received Clyde Severson's May 13, 2009 letter and stating, in response, that defendants were thoroughly reviewing both mortgage accounts. Pltf.'s Ex. 8, pp. 1.

On May 29, 2009, defendants sent plaintiffs a "Notice of Collection Activity" for the Hwy. 234 property. Pltf.'s Ex. 22, pp. 1-2. The notice was generated by defendants' collections department and stated that plaintiffs were in default on the Hwy. 234 mortgage for failure to make the April and May 2009 payments. Id. On June 29, 2009, defendants' collections department sent plaintiffs a Notice of Collection Activity for both the Gladstone and Hwy. 234 properties. Pltf.'s Ex. 9, pp. 1-2; Pltf.'s Ex. 23, pp. 1. The notices informed plaintiffs that they were in default on the Gladstone and Hwy. 234 mortgages for failure to make the mortgages' May and June 2009 payments. Id. Defendants continued to send these notices to plaintiffs

through the end of 2009. Clyde Severson Aff., ¶¶ 20, 35. In addition, defendants posted default documents on plaintiffs' door on July 11, 2009. Id., ¶ 18.

The record does not indicate whether plaintiffs ever received a personal communication or official summary from defendants detailing defendants' alleged review of the Gladstone and Hwy. 234 mortgage accounts. The record does reveal, however, that plaintiffs made the mortgage payments on which defendants said plaintiffs' were delinquent.[6] Plaintiffs made the April and May 2009 payments on the Hwy. 234 mortgage at the beginning of March and April respectively. Pltf.'s Ex. 10, pp. 2. Plaintiffs made the May and June 2009 payments on the Gladstone property at the beginning of April and June respectively. Id.

An almost identical sequence of events, as those detailed above, occurred again the following year. Def.'s Mem. in Supp. of Mot., pp. 4. In 2009, Foremost sent defendants a bill for $2,826, for the December 15, 2009 to December 15, 2010 policy period. Id.; Def. Ex. 5, pp. 10. This bill represented the premiums for all fourteen properties under plaintiffs' umbrella insurance policy.[7] Def. Ex. 5, pp. 10. Defendants paid the bill in full. Def. Ex. 5, pp. 10. The record does not indicate to which account(s) defendants applied the bill. On December 4, 2009, Foremost also billed plaintiffs for the December 15, 2009 to December 15, 2010 policy period. Def. Ex. 3, pp. 8. This bill included the premiums for plaintiffs' twelve properties not serviced by defendants and came to $2,236. Id. The record indicates plaintiffs paid the bill on December 10, 2009. Id.

On January 5, 2010, Foremost reimbursed plaintiffs for defendants' payment of insurance premiums on plaintiffs' properties not serviced by defendants. Def. Ex. 5, pp. 4. The amount Foremost reimbursed was $2,531. Id. On January 15, 2010, plaintiffs reimbursed defendants the

---

[6] It is not clear from the record whether these payments included any escrow payments.
[7] The bill was countersigned on October 28, 2009. Def.'s Ex. 5, pp. 10.

full $2,531 plaintiffs received from Foremost. Pltf.'s Ex. 10, pp. 7. Plaintiffs continued,

however, to refuse to pay the increased escrow charges that defendants assessed as a result of

paying plaintiffs' entire umbrella policy with Foremost.[8] Def.'s Mem. in Supp. of Mot., pp. 4.

Because plaintiffs were not making the increased escrow payments, defendants diverted

plaintiffs' payments into suspense accounts. Id. Defendants would only apply the money in the

suspense accounts to the mortgages when the accounts had sufficient funds to make a mortgages'

monthly payment in full, including the increased escrow charges.[9] Id. As a direct consequence

of this action, defendants determined plaintiffs were delinquent on the mortgages for failure to

make full payments. Id. Plaintiffs maintained that defendants' overpayments to Foremost were

solely the responsibility of defendants. Id. Defendants, on the other hand, asserted that they

were being overbilled by Foremost and simply complying with the terms of the mortgages by

paying Foremost's bills and increasing plaintiffs' escrow payments to compensate. Id.

In September of 2010, defendants stopped accepting plaintiffs' loan payments for both

the Gladstone and Hwy. 234 properties. Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 9, 13. On

October 11, 2010, Northwest Trustee Services, Inc., a successor trustee on the Hwy. 234

mortgage, recorded a "Notice of Default and Election to Sell" under Oregon's non-judicial

foreclosure statutes. Def. Ex. 7, pp. 1-2. On October 20, 2010, plaintiffs sent Northwest Trustee

Services, Inc. a letter stating that plaintiffs were not behind on their mortgage payments and that

the error arose because defendants had overpaid the properties' insurance premium two years in

a row. Def. Ex. 27, pp. 1. Plaintiffs further stated in the letter that they wanted the foreclosures

and "harassing" phone calls to stop. Id. On November 5, 2010, defendants returned plaintiffs'

---

[8] The record does not indicate why defendants did not adjust plaintiffs' escrow payments down to their original
levels after defendants received refunds for their insurance overpayments.
[9] Defendants assert that they were obligated, according to the terms of the mortgages, to follow this procedure.
Def.'s Mem. in Supp. of Mot., pp. 4.

November payments for both the Gladstone and Hwy. 234 mortgages, explaining in a letter that, "due to the status of the loan you need to make a payment in full on the delinquent account." Pltf.'s Ex. 16, pp. 1.

Northwest Trustee Services, Inc. filed a "Notice of Default and Election to Sell" regarding the Gladstone property on December 3, 2010. Def. Ex. 27, pp. 3-4. Plaintiffs' payments on both mortgages for December of 2010 and January of 2011 were also rejected by defendants for failure to make a "payment in full on the delinquent account." Pltf.'s Ex. 16, pp. 2, 4. Around this time, a similar sequence of events regarding the Gladstone and Hwy. 234 insurance premiums was set in motion for the December 15, 2010 to December 15, 2011 policy period. Def.'s Mem. in Supp. of Mot., pp. 4.

Before the Gladstone and Hwy. 234 properties' scheduled foreclosure sales, plaintiffs elected to reinstate the properties' mortgages by paying the amounts due. Def.'s Mem. in Supp. of Mot., pp. 4. Plaintiffs stated that they did so under duress and to protect Susan Severson's health. Clyde Severson Aff., ¶ 26. On February 10, 2011, plaintiffs paid defendants $11,543.07 to terminate the non-judicial foreclosure proceeding on the Hwy. 234 property. Def.'s Ex. 8, pp. 2. On March 15, 2011, plaintiffs paid defendants $7,073.41 to terminate the non-judicial foreclosure proceeding on the Gladstone property. Id., pp. 1. These sums comprised late fees, attorney fees, recording fees, and monthly payments on which defendants claimed plaintiffs were delinquent. Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 10. Canceled checks present in the record show that plaintiffs were current on their monthly payments as of August 2010.[10] Pltf.'s Ex. 10, pp. 7-15.

After the termination of the foreclosure proceedings, plaintiffs began making payments on the Gladstone and Hwy. 234 properties' mortgages again. Pltf.'s Mem. in Resp. to Def.'s

---

[10] Once again, it is not clear from the record whether these payments included any escrow payments.

Mot., pp. 10. Defendants refused to accept plaintiffs' payments, however, stating that they could not process them because the parties were engaged in litigation regarding the loans. Pltf.'s Ex. 16, pp. 4.

Defendants' determination that plaintiffs were delinquent on the Gladstone and Hwy. 234 mortgages harmed plaintiffs' credit score. Third Am. Compl., ¶ 9. As a result of plaintiffs' alleged delinquency, plaintiffs' credit score fell from 780 to the low 600s, making it difficult for plaintiffs to secure the credit they needed from institutional lenders to continue investing in properties, a key source of plaintiffs' income. Id.; Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 14. Plaintiffs' credit report from October 16, 2010 places their score between 605 and 645. Pltf.'s Ex. 30, pp. 2.

On November 24, 2010, Sterling Savings Bank denied plaintiffs' request to refinance three loans, citing "delinquent credit obligations." Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 14; Pltf.'s Ex. 32, pp. 1. On January 15, 2011, plaintiffs requested an increase and extension of their $750,000 line of credit with Premier West Bank, so that they could continue investing in property. Pltf.'s Ex. 37, pp. 1. Premier West Bank rejected plaintiffs' request and demanded plaintiffs pay, in full, their outstanding loan by December of 2011. Id.; Pltf.'s Mem. in Resp. to Def.'s Mot., 15. In order for plaintiffs to pay the balance of their Premier West Bank loan, which was approximately $375,000, plaintiffs had to use cash reserves and borrow from relatives. Pltf.'s Mem. in Resp. to Def.'s Mot., 15.

After the termination of foreclosure proceedings, plaintiffs still struggled to obtain financing and credit from institutional lenders. Plaintiffs' request for auto financing was denied by Capital One on March 4, 2011, and plaintiffs' request for a line of credit was denied by Keybank National Association on July 26, 2011. Pltf.'s Ex. 38, pp. 1; Pltf.'s Ex. 39, pp. 1. Both

lenders based their rejection of plaintiffs' application on delinquencies in plaintiffs' past credit obligations.[11] Id.

Plaintiffs also allege that their experience with defendants, including calls they received from defendants, caused them significant stress. From mid-2008 until the beginning of 2011, plaintiffs received calls from agents or employees of defendants who informed plaintiffs that they were in default on the Gladstone and Hwy. 234 mortgages. Clyde Severson Dep., pp. 4; Def. Ex. 10, pp. 4-6. During these calls, plaintiffs repeatedly insisted that defendants had made accounting mistakes and that plaintiffs were not in default. Clyde Severson Dep., pp. 6. Clyde Severson also advised these callers that his wife, Susan Severson, was ill and asked that defendants' agents and employees stop calling. Def.'s Ex. 10, pg. 4; Pltf.'s Ex. 6, pp. 3. As a result of the alleged delinquencies and calls, Clyde Severson witnessed his wife become physically and emotionally ill. Clyde Severson Aff., ¶ 1. Susan Severson also witnessed the effects of the stress and anxiety that contesting defendants' delinquency claims took on Clyde Severson. Susan Severson Aff. ¶ 6.

Plaintiffs brought this action on November 12, 2010. Compl. The complaint currently before the court was filed on September 24, 2012 and alleges breach of contract, intentional infliction of emotional distress, negligent injury to reputation and defamation, money had and received, and wrongful initiation of civil proceedings.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) authorizes summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[11] The record does not reflect any delinquencies by plaintiffs prior to or concurrent with those alleged regarding the Gladstone and Hwy. 234 properties. Moreover, plaintiffs state that they have never had any problems with lenders or with obtaining credit, prior to defendants assuming the Gladstone and Hwy. 234 mortgages. Susan Severson Aff., ¶ 3

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The burden is on the

moving party to point out an absence of a genuine issue of fact.  Celotex Corp. v. Cattrett, 477

U.S. 317, 325 (1986).  When the moving party shows the absence of an issue of material fact, the

nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial.

Id. at 324.  An issue of fact is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## DISCUSSION

On October 25, 2012, defendants filed a Motion for Partial Summary Judgment on

plaintiffs' wrongful initiation of civil proceeding claim, punitive damages claims, and the issue

of whether defendants can be held liable for any conduct committed by Washington Mutual

Bank.[12]  The Court has previously dismissed plaintiffs' claim to punitive damages regarding their

breach of contract claim (#28).

I.      **Wrongful Initiation of Civil Proceeding Claim**

A. **Parties' Arguments**

Plaintiffs seek $500,000 in economic and non-economic damages and $25,000,000 in

punitive damages for their claim of wrongful initiation of civil proceedings.  Defendants contend

that plaintiffs' claim for wrongful initiation of civil proceedings fails as a matter of law.

Therefore, defendants seek summary judgment.

In order to state a claim for wrongful initiation of civil proceedings, plaintiffs must prove

five elements.  Alvarez v. Retail Credit Ass'n of Portland, Or., Inc., 234 Or. 255, 259-60 (1963).

The first element plaintiffs must prove is "the commencement and prosecution by the defendant

---

[12] Plaintiffs have clarified that they are not seeking to hold defendants liable for any conduct committed by
Washington Mutual Bank. Pltf.'s Mem. in Resp. to Def.'s Mot., 2.  Therefore, the Court does not address this
component of defendants' motion.

of a judicial proceeding against the plaintiff." Id. at 259. Here, this element delineates the threshold question: Did defendants initiate a judicial proceeding when they foreclosed non-judicially on plaintiffs' properties?

Because this question is one of first impression, the Court must make a reasonable determination of how the Oregon Supreme Court would resolve the issue. See Aetna Cas. & Sur. Co. v. Sheft, 989 F.2d 1105, 1108 (9th Cir. 1993). Plaintiffs argue their claim should survive summary judgment because there is no meaningful difference between a judicial foreclosure and a non-judicial foreclosure. Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 25. Plaintiffs contend that a lender who forecloses on a borrower non-judicially is simply exercising rights that the lender would otherwise exercise under judicial supervision. Thus, according to plaintiffs, both types of foreclosure provide a basis for a wrongful initiation claim, when initiated without probable cause. Id.

Plaintiffs also analogize non-judicial foreclosures to administrative proceedings, which the Oregon Supreme Court has determined satisfy the judicial proceedings element. Donovan v. Barnes, 274 Or. 701, 705 (1976). The Oregon Supreme Court based this decision in part on the fact that defendants can experience "the same harmful consequences" as a result of both types of proceedings. Id. Plaintiffs extend this reasoning to non-judicial foreclosures, arguing that because borrowers can lose their home whether the lender forecloses judicially or non-judicially, both should constitute a judicial proceeding, for the purposes of this claim. Pltf.'s Mem. in Resp. to Def.'s Mot., pp. 25. Defendants oppose plaintiffs' argument, contending that Oregon courts have only found that proceedings involving formal judicial or administrative proceedings satisfy the judicial proceeding element. Def.'s Mem. in Supp. of Mot., pp. 10. Defendants point out that non-judicial foreclosures do not involve any type of formal adjudicatory proceeding. Id.

### B. History of Non-Judicial Foreclosure in Oregon

In Oregon, lenders traditionally foreclosed on delinquent property owners by filing a lawsuit seeking a court-ordered foreclosure. *See* O.R.S.§ 88.010. This changed in 1959 when the Oregon legislature passed the Oregon Trust Deed Act (OTDA). The OTDA gave lenders the option of foreclosing on defaulting property owners by privately advertising and selling the property, rather than by filing suit. Niday v. GMAC Mortg., LLC, 251 Or. App. 278, 280 (2012); O.R.S. § 86.710.

The Oregon legislature's rationale for passing the OTDA in 1959 can only be imperfectly gleaned from the legislative record. The record for the original Act, however, as well as for the 1961 amendments, indicates that the legislature believed lending would increase in the state, helping small borrowers, if lenders had a faster and less expensive way to foreclose. Committee on Financial Affairs, Public Hearing, Feb. 12, 1959, pp. 1. In 1961, the legislature made several amendments to the Act. During testimony before the House Committee on State and Federal Affairs on April 24, 1961, Committee members were reassured that non-judicial foreclosures did not pose additional risk to borrowers. House Committee on State and Federal Affairs, April 24, 1961, pp. 2. Representatives of the Portland Board of Realtors and the Oregon Savings and Loan League testified that there was little risk of lenders wrongfully foreclosing non-judicially. When pressed by a Committee member on this point, these representatives testified that lending companies gave every borrower the opportunity to save his home and worked with borrowers to help them do so. Id. at 1-2.

On April 28, 1961, the House Committee on State and Federal Affairs also considered the availability of judicial remedies for borrowers wrongly foreclosed upon non-judicially. The minutes reflect that the committee was convinced that the OTDA did not prevent judicial

involvement in cases involving fraud, mistake, abuse, or other situations where the legal facts

were at issue. Thus, the Committee was satisfied that borrowers were sufficiently able to avail

themselves of the judicial system if lenders wrongly foreclosed.

The legislature went on to amend the Act in subsequent years to ensure that it provided

lenders with quick and inexpensive foreclosures and that it protected borrowers from

unscrupulous lenders. James v. ReconTrust Co., 845 F. Supp. 2d 1145, 1151 (D. Or. 2012).

Upon reviewing the Act in 2006, the court in Staffordshire Investments, Inc. v. Cal-W.

Reconveyance Corp., 209 Or. App. 528, 542 (2006), found:

> The Act represents a well-coordinated statutory scheme to protect grantors [borrowers]
> from the unauthorized foreclosure and wrongful sale of property, while at the same time
> providing creditors [lenders] with a quick and efficient remedy against a defaulting
> grantor. As discussed above, it confers upon a trustee the power to sell property securing
> an obligation under a trust deed in the event of default, without the necessity for judicial
> action. However, the trustee's power of sale is subject to strict statutory rules designed to
> protect the grantor [borrower], including provisions relating to notice and reinstatement.

Although the court in Staffordshire Investments determined that Oregon's statutory

framework for non-judicial foreclosure competently achieved the legislature's policy goals, the

subsequent financial crisis in 2008 dramatically changed the home financing landscape in

Oregon and across the country. The legislature tacitly acknowledged this when it amended the

OTDA in 2008 and 2009 to enhance foreclosure notice requirements, as well as in 2012 when it

required pre-foreclosure mediation. ReconTrust Co., 845 F. Supp. 2d at 1151 (D. Or. 2012)

The 2012 amendments require lenders to meet with borrowers and a mediator before

lenders initiate a non-judicial foreclosure. O.R.S. §§ 86.705-86.795. This mediation is intended

to provide a forum in which lenders and borrowers can discuss "foreclosure avoidance

measures." Id. It also gives borrowers, however, the opportunity to engage in a conversation

with their lender and the opportunity to point out errors related to their foreclosure proceedings.

Thus, the amendments help empower borrowers to avoid foreclosures conducted without judicial
oversight.

### C. Analysis

In light of the legislature's rationale for creating non-judicial foreclosure in Oregon, as
well as its recent amendments to the OTDA, the Court believes classifying non-judicial
foreclosure as a judicial proceeding would be inappropriate.

The Court finds that the legislature intended to create a meaningful difference between
non-judicial foreclosure and judicial foreclosure, when it passed the OTDA in 1959. The Oregon
legislature created non-judicial foreclosure for the explicit purpose of bypassing the adjudicatory
process. It did this for compelling policy reasons. The legislature wanted to enable lenders to
foreclose on delinquent borrowers without the time and expense inherent to any adjudication
because the legislature believed this would incentivize more lending in Oregon, stimulating the
real estate market. The legislature believed it could accomplish this without unduly subjecting
borrowers to wrongful foreclosure and without preventing borrowers from availing themselves
of the judicial system in cases of wrongful foreclosure. Moreover, the court has recently
revisited and amended the Act to ensure it continues to accomplish these policy objectives, while
sufficiently safeguarding borrowers.

The Court also distinguishes Donovan. In Donovan, the Oregon Supreme Court
concluded that "an action for malicious prosecution may be based upon the initiation or
instigation of an administrative proceeding of a judicial nature and that the rules and standards
that govern actions based upon civil proceedings should also apply to actions based upon
administrative proceedings." Id. In deciding this, the court emphasized that both were
adjudicatory proceedings and that the function of the proceedings was essentially the same,

whether they took place in front of an administrative body or a judicial tribunal. Id. at 704-05.

The Court distinguishes <u>Donovan</u> on the basis, as explained above, that the defining element of non-judicial foreclosure is that it intentionally and explicitly lacks a "judicial nature." In distinguishing <u>Donovan</u>, the Court notes that the legislature has considered and preserved other judicial remedies for borrowers wrongly foreclosed upon, including claims of fraud, mistake, abuse, and breach of contract. House Committee on State and Federal Affairs, April 28, 1961. *See also*, <u>Staffordshire Investments</u>, 209 Or. App. at 543-544. Thus, it is not vital that borrowers be able to bring a claim for wrongful initiation of civil proceeding in order to gain judicial relief for wrongful foreclosure.

The Court finds that non-judicial foreclosures do not constitute a judicial proceeding and that construing a non-judicial foreclosure as a judicial proceeding for the purposes of this claim is contrary to legislative intent. Thus, the Court does not reach the claim's other determinative elements and GRANTS defendants' motion for summary judgment on plaintiffs' wrongful initiation of civil proceedings claim.

## II.    Punitive Damages

Plaintiffs seek recovery of $25,000,000 in punitive damages for their claims of intentional infliction of emotional distress, negligent injury to reputation and defamation, and wrongful initiation of civil proceedings. Plaintiffs seek punitive damages of $20,000,000 for their money had and received claim. Defendants contend that plaintiffs have not produced the "clear and convincing" evidence required by O.R.S. § 31.730(1) to recover punitive damages for any of the claims listed above. Consequently, defendants seek summary judgment regarding plaintiffs' claims to punitive damages.

Punitive damages are recoverable when plaintiff(s) prove "by clear and convincing

evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." O.R.S. 31.730(1).

In order for evidence of a party's conduct to rise to the level of clear and convincing, "the truth of the facts asserted must be highly probable," and the evidence must be "free from confusion, fully intelligible, (and) distinct." Riley Hill Gen. Contractor, Inc. v. Tandy Corp., 303 Or. 390, 407 (1987). The evidence must also indicate "a degree of culpability greater than inattention or simple negligence." Badger v. Paulson Inv. Co., Inc., 311 Or. 14, 28 (1991) (*citing* Andor v. United Air Lines, 303 Or. 505, 511–13 (1987)). Where negligence is a factor in defendants' conduct, punitive damages are only available when evidence of negligence is accompanied by additional factors demonstrating "aggravated misconduct." Jane Doe 130 v. Archdiocese of Portland in Oregon, 717 F. Supp. 2d 1120, 1140 (D. Or. 2010).

Although "clear and convincing evidence" is the legal standard for awarding punitive damages in Oregon, the Oregon Supreme Court has pointed out that punitive damages are imposed in a range of contexts for a range of reasons. Andor by Affatigato v. United Air Lines, Inc., 303 Or. 505, 511 (1987). The Oregon Supreme Court also stated that the standard can and should be adjusted to fit the "type" of defendant before the court. Id. at 510-512.

The court in Archdiocese of Portland identified institutional actors as one "type" of defendant for whom punitive damages may be especially appropriate. 717 F. Supp. 2d at 1140 (D. Or. 2010) (*citing* Andor v. United Air Lines, 303 Or. 505, 510–11 (1987)). The court noted that institutional defendants frequently hold and wield power that can disproportionately harm private and public interests. Id. As a result, the court reasoned that levying punitive damages

can usefully deter institutional defendants, among others, from using their disproportionate power in risky or socially irresponsible ways. Id.

### A. Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress ("IIED"), plaintiffs must plead facts that show: (1) defendants intended to inflict severe emotional distress on plaintiff, or knew that such distress was certain, or substantially certain, to result from the conduct; (2) defendants' acts were the cause of plaintiffs' severe emotional distress; and (3) defendants' acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Staudenraus, 321 Or. 532, 543 (1995) (citing Sheets v. Knight, 308 Or. 220, 236 (1989)). The Oregon Supreme Court has held that if these elements are proven, and an "extraordinary" or "extreme transgression" of social norms is an "indispensable element" of the tortious conduct, punitive damages are available for an IIED claim. Hall v. May Dept. Stores Co., 292 Or. 131, 144-145 (1981).

In this case, plaintiffs have provided clear and convincing evidence that defendants inflicted emotional distress on plaintiffs regarding each of the above listed elements. Plaintiffs' evidence that defendants knew the mortgage accounts were in error and that Susan Severson was undergoing chemotherapy raises a genuine issue regarding whether defendants knew plaintiffs were substantially certain to experience emotional distress when it declared them delinquent on their mortgages. Plaintiffs' evidence that both plaintiffs exhibited physical and emotional symptoms of stress, as a result of defendants declaring them delinquent on their mortgages, is sufficient to show that there is a genuine issue regarding whether plaintiffs suffered severe emotional distress and whether defendants' conduct constituted a transgression of socially tolerable conduct. Moreover, Plaintiffs' evidence is sufficient to raise a genuine issue of fact

regarding whether defendants' alleged transgression is an indispensable element of defendants'

tortuous conduct. Plaintiffs' evidence is also buoyed by the fact that defendants, as plaintiffs'

creditor, is an institution that occupied a position of power vis-à-vis plaintiffs and so is burdened

by an additional standard of care.

In sum, plaintiffs have met the evidentiary burden necessary to survive defendants'

motion for summary judgment. Accordingly, the Court DENIES defendants' motion for

summary judgment for punitive damages on plaintiffs' IIED claim.

### B. Negligent Injury to Reputation and Defamation

To recover punitive damages for negligent injury to reputation and defamation ("NIRD"),

plaintiffs must prove by clear and convincing evidence that defendants' conduct vis-à-vis

plaintiffs' mortgages amounted to more than simple negligence, rising to the level of "aggravated

misconduct." Archdiocese of Portland, 717 F. Supp. 2d at 1140. No one definition of

aggravated misconduct exists. Rather, the court in Boger v. Norris & Stevens, Inc., 109 Or. App.

90, 95 (1991), defined it as conduct "over and above the negligent conduct that produced

[plaintiffs'] injuries." In Georgetown Realty, Inc. v. The Home Ins. Co., 113 Or. App. 641, 645

(1992), the court based its aggravated misconduct finding on the fact that "there was clear and

convincing evidence that defendants acted intentionally or recklessly to protect its own interests

at the expense of plaintiff's." In Boger, the court found defendants were guilty of aggravated

misconduct based on evidence "defendants attempted to intimidate plaintiffs." 109 Or. App. at

95 (1991).

Here, plaintiffs have produced evidence that defendants overpaid the insurance bills on

two of plaintiffs' properties and repeatedly failed to correct the mortgage account balances

attached to the properties. Plaintiffs have also produced evidence that, as a result of defendants'

failure to correct the mortgages' accounts, defendants declared plaintiffs delinquent on the mortgages and notified credit reporting agencies. There is further evidence that by notifying credit reporting agencies of plaintiffs' alleged delinquencies, defendants adversely affected plaintiffs' reputation with institutional lenders making it difficult, if not impossible, for plaintiffs to secure the credit they needed to continue investing in property as part of their livelihood.

Plaintiffs' evidence that defendants failed to correct accounting mistakes regarding plaintiffs' mortgages raises a genuine issue regarding whether defendants' conduct constituted negligence. Plaintiffs' evidence that defendants foreclosed on the properties without formally resolving the accounting issues with plaintiffs suggests, at the very least, recklessness, raising the additional genuine issue of whether defendants' behavior constituted aggravated misconduct. Consequently, plaintiffs have submitted sufficient evidence to survive defendants' motion for summary judgment. Accordingly, the court DENIES defendants' motion for summary judgment for punitive damages on plaintiffs' NIRD claim.

### C. Money Had and Received

Plaintiffs are eligible to recover punitive damages on money had and received claims if they can prove that either: defendants are guilty of tortious conduct by clear and convincing evidence, or defendants threatened suit against plaintiffs knowing that they did not have a rightful claim against plaintiffs. Adams v. Crater Well Drilling, Inc., 276 Or. 789, 794 (1976). Although there is no precise definition of a tort, a tort is generally a breach of a legal duty, not created by a contract, which results in damages. Urban Renewal Agency of City of Coos Bay v. Lackey, 275 Or. 35, 38 (1976). The legal duty breached can be imposed by common law or by statute. Id.

Here, plaintiffs have raised a genuine issue of fact regarding whether defendants breached

their legal duty to plaintiffs when they overpaid the properties' insurance premiums and, as a direct result, increased plaintiffs' escrow payments. This alleged legal duty, however, stems from plaintiffs' mortgage contracts with defendants. Thus, plaintiffs have alleged a breach of contract by defendants and not tortious conduct. Plaintiffs have also failed to submit clear and convincing evidence that defendants scheduled the foreclosure sales with the knowledge that they lacked a rightful reason for doing so. Moreover, threatening a non-judicial foreclosure is not analogous to threatening suit. Consequently, plaintiffs have not submitted sufficient evidence to survive defendants' motion for summary judgment. Accordingly, the Court GRANTS defendants' motion for summary judgment for punitive damages on plaintiffs' money had and received claim.

## RECOMMENDATION

For the reasons stated above, defendants' motions for summary judgment on plaintiffs' wrongful initiation of civil proceedings claim should be GRANTED. Defendants' motion for summary judgment on plaintiffs' claim to punitive damages for intentional infliction of emotional distress and negligent injury to reputation and defamation should be DENIED. Defendants' motion for summary judgment on plaintiffs' claim to punitive damages for money had and received should be GRANTED.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Federal Rule of Appellate Procedure Rule 4(a)(1) should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due no later than fourteen days after the date this recommendation is filed. If objections are filed, any response is due within fourteen days after*

*the date the objections are filed. See* FED. R. CIV. P. 72, 6.  Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED this _____ day of March, 2013.

MARK D. CLARKE

United States Magistrate Judge